[No. C060468. Third Dist. Mar. 29, 2013.]

BARBARA COLLINS, Plaintiff and Appellant, v.
NAVISTAR, INC., Defendant and Respondent.

## Counsel

Law Offices of Carcione, Cattermole, Dolinski, Okimoto, Stucky, Ukshini, Markowitz & Carcione, Law Offices of Carcione, Cattermole, Dolinski, Stucky, Markowitz & Carcione, Joseph W. Carcione, Jr., Gary W. Dolinski, Joshua S. Markowitz; Drivon Turner & Waters, Davey L. Turner; Smith & McGinty, Daniel U. Smith and Valerie T. McGinty for Plaintiff and Appellant.

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen, Aaron S. McKinney; Harrington, Foxx, Dubrow & Canter, David H. Canter; Kroloff, Belcher, Smart, Perry & Christopherson, Thomas O. Perry; Nolen & Owens and Rudey Nolen for Defendant and Respondent.

## Opinion

**HOCH, J.**—In this strict products liability case, we consider whether the criminal nature of a juvenile's act of throwing rocks and concrete from a freeway overpass relieves a truck manufacturer of the duty to design windshields capable of withstanding common road hazards, such as objects hitting windshields. For the reasons that follow, we conclude the criminal nature of the rock throwing does not cut off liability or negate the duty of the manufacturer to design the truck's windshield to account for reasonably foreseeable risks. We also explain that the definition of negligence for premises liability has no application in strict products liability cases.

This action arises out of injuries plaintiff William F. Collins sustained while driving a big rig truck manufactured by Navistar, Inc. A 2.5-pound piece of concrete thrown by 15-year-old Joshua Daniel penetrated the windshield of the truck and struck William in the head. Daniel would later plead to three counts of assault with a deadly weapon or with force likely to cause great bodily injury and be sentenced to serve 12 years in prison.

William and his wife, Barbara Collins, sued various defendants, including Navistar.[1] As to Navistar, plaintiffs claimed the windshield of the truck was defective because its penetration resistance was inadequate. They sought to show two alternative designs would have been safer: (1) windshields made out of "glass-plastic" and (2) windshields with greater rake angles to deflect road debris. The trial court excluded evidence relating to glass-plastic on the grounds of federal preemption. The case proceeded to jury trial against Navistar only on the question of whether the windshield was defective due to its steep rake angle. At trial, Navistar argued that Daniel's criminal conduct constituted a "superseding cause" of the injury. A superseding cause "absolves a tortfeasor [of liability], even though his [or her] conduct *was* a substantial contributing factor, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him [or her] responsible." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*).) The special verdict form indicates the jury accepted this defense, and judgment was entered in favor of Navistar.

On appeal, Barbara challenges the jury instructions and verdict form as erroneously requiring heightened foreseeability solely due to the criminal nature of Daniel's rock throwing. She contends the proper standard is whether it is foreseeable that the sort of object thrown in this case will hit truck windshields. Answering this question in the affirmative, Barbara asserts the instructional error was prejudicial. Barbara also challenges various evidentiary rulings related to the issue of foreseeability. And, she contends it was error to exclude the glass-plastic evidence. Navistar concedes this error, but urges it was harmless because the jury decided the case on superseding cause and never reached the question of design defect.

We conclude the trial court erred in instructing that a heightened foreseeability was required and the error was prejudicial because the special verdict form precluded the jury from considering whether the risk of chunks of concrete hitting the truck's windshield was a reasonably foreseeable road hazard. We accept Navistar's concession that federal law is not preemptive on the issue of whether glass-plastic would have been a safer design for the windshield. Accordingly, we reverse and remand for a new trial.

To provide guidance to the trial court on retrial, we address Barbara's evidentiary contentions. Consistent with our conclusion about the standard of

---

[1] William subsequently passed away. Pursuant to rule 8.36 of the California Rules of Court, coplaintiff Barbara, successor in interest, is substituted as appellant. Even though Barbara is the sole appellant, we nonetheless refer to William and Barbara as plaintiffs in recounting their positions and arguments at trial. Insofar as we refer to plaintiffs individually by their first names, we do so for the sake of clarity.

reasonable foreseeability for strict products liability, we conclude Barbara was entitled to introduce evidence that chunks of concrete hitting truck windshields was not an unforeseeably rare occurrence. However, we reject Barbara's assertions of error in the trial court's admission and exclusion of expert testimony proffered by the parties.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Incident*

In the early morning of December 4, 1997, Joshua Daniel was on top of the south levee of Smith Canal, throwing rocks—pieces of concrete and asphalt found on the levee—at passing vehicles. Interstate Highway 5 crosses over the Smith Canal just south of Country Club Boulevard. Riprap, including chunks of concrete, lines the waterside slope of Smith Canal to the levee.

Daniel chose rocks about the size of baseballs and threw them overhand, hard enough to hurt anyone he hit. He spent 10 to 15 minutes throwing rocks and hit a few vehicles. He threw a chunk of concrete weighing about two and a half pounds at a Navistar tractor pulling two trailers driven by William. The rock penetrated the windshield and hit William in the forehead, causing severe brain injuries. William lost control of the truck and it hit the sound wall. Daniel heard a large crash.

Daniel was convicted of three counts of assault with a deadly weapon or with force likely to cause great bodily injury. He was sentenced to 12 years in prison.

### *The Lawsuit*

William and Barbara brought suit against Navistar (previously International Truck and Engine Corporation), the State of California, and several other defendants.[2] Their claim against Navistar was for products liability, alleging the truck's windshield was defective because it failed to keep the rock that Daniel threw from penetrating.

The complaint also sought punitive damages on the grounds that Navistar knew the truck was defective. Navistar moved to strike portions of the complaint relating to punitive damages. The motion was granted with leave to amend. Plaintiffs filed an amendment with new allegations against Navistar regarding punitive damages. Navistar's motion to strike this amendment was denied.

---

[2] At trial, the only defendants were Navistar and the state. Plaintiffs settled with the state while this appeal was pending.

Plaintiffs offered two alternative designs for the windshield. First, they contended the type of glass was defective; instead of a single laminated glass, it should have been made of bilaminated glass known as glass-plastic. Second, plaintiffs contended the rake angle of the windshield should have been less steep, a more sweptback design, to deflect the rock.[3]

### Exclusion of Glass-plastic Evidence

Two defendants, the manufacturer of the windshield and the supplier of the glass, moved for summary judgment, asserting a state tort action for products liability was preempted by federal law. The windshield in the truck William drove was two layers of glass between which is a bonded layer of plastic. The windshield was manufactured in accordance with Federal Motor Vehicle Safety Standard No. 205 (FMVSS 205).[4] FMVSS 205 also authorized the use of glass-plastic in windshields.[5]

The trial court granted both motions for summary judgment, finding plaintiffs' claims were preempted by federal law.

In light of these rulings, Navistar moved in limine to exclude any evidence of glass-plastic windshields. The trial court granted the motion.

### Summary Adjudication on Punitive Damages

Navistar moved for summary adjudication of plaintiffs' punitive damages claim. Navistar contended plaintiffs had no evidence of fraud, oppression, or malice; the windshield complied with all safety standards; Navistar had not

---

[3] The windshield of the Navistar 8200 driven by William had a rake angle of 71.2 degrees from horizontal (90 degrees being straight vertical). For comparison, plaintiffs' expert offered the Ford F-650, which had a rake angle of 37.6 degrees. The expert conducted a test with the rake angle of the windshield of the Navistar 8200 changed to 52 degrees. Under the conditions of the test (the assumptions of which, particularly the speed of the truck and the rock, were hotly disputed), the rock skipped on the windshield and did not penetrate it. No manufacturers of heavy trucks had a windshield design as plaintiffs' expert proposed. The angle of windshields varies by type of vehicle. Heavy trucks are generally 27 degrees from vertical (63 degrees from horizontal), while passenger cars are more sloped at 55 or 65 degrees from vertical (45 or 35 degrees from horizontal). Navistar's expert opined that changing the rake angle of the truck's windshield was not a trivial change and created safety and operational issues, particularly as to visibility.

[4] The purpose of FMVSS 205 is to (1) reduce injuries resulting from impact with the glazing surfaces; (2) minimize the possibility of occupants being thrown through the windshield in collisions; and (3) ensure a necessary degree of transparency in the glazing for driver visibility.

[5] Conventional windshields, such as the one in the truck at issue, are a three-ply design consisting of two plies of glass sandwiched around a thin interply of plastic. Glass-plastic is similar except it has an inner plastic liner bonded to the side of the windshield facing the passenger compartment.

previously heard of glass-plastic; and Navistar had no notice of prior incidents where a projectile penetrated a windshield on one of its trucks. Navistar also noted the glass in the truck was not the original equipment.

The trial court granted the motion. The court found that since it was undisputed that the windshield had been replaced, the glass in the windshield at the time of the accident was not the "product" of Navistar.

### Dr. Rose Ray's Testimony

Navistar's primary defense was that Daniel's criminal assault constituted a superseding cause of plaintiffs' injuries and Daniel alone was responsible for the injuries he caused. To support its argument that the assault by Daniel was not reasonably foreseeable, Navistar offered the testimony of Rose Ray, Ph.D., a statistician. Plaintiffs moved in limine to exclude her testimony, contending her methodology was without scientific merit, her opinions lacked a factual basis, and her testimony would confuse and mislead the jury. Plaintiffs argued the databases on which Dr. Ray relied were unreliable, contained too small a sample, and were misleading.

At a hearing pursuant to Evidence Code section 402, Dr. Ray testified about the databases she used in forming her opinions. One database was the Fatality Analysis Reporting System or FARS, collected by the National Highway Traffic Safety Administration (NHTSA). FARS is a census of all fatal traffic accidents in the United States. For purposes of the census, an accident is considered fatal where the fatality occurs within 30 days of the accident and is attributable to the crash. FARS is believed to be 99 percent accurate and is considered the gold standard of databases. The NHTSA relies on it to develop vehicle safety standards and to evaluate their effectiveness.

Another database used was the National Automotive Sampling System General Estimates System known as NASS/GES or simply GES. It was developed by the NHTSA to study traffic safety and is relied on by traffic safety professionals and statisticians. GES includes a representative sample of crashes of all levels of severity that are reported by the police.

Dr. Ray also used the National Automotive Sampling System Crashworthiness Data System or CDS and the Large Truck Crash Causation Study or LTCCS. CDS is a representative sample of passenger vehicle crashes that were severe enough to require towing. The database includes information from witness interviews, crash reconstruction, and evaluation of the vehicles involved. The database is maintained by the NHTSA. The LTCCS is a representative sample, similar to the CDS, but focuses on large trucks rather than passenger vehicles.

Dr. Ray downloaded various site tables prepared by the federal Department of Transportation. These tables set forth calculations of vehicle miles traveled for different kinds of vehicles.

Dr. Ray performed a search on Factiva for 1997, the year of William's crash. Factiva is an Internet search engine that consists primarily of newspaper reports. The search turned up the incident giving rise to this case.

Dr. Ray also reviewed the deposition of plaintiffs' statistician, Steven Crump.[6] Crump relied on the FARS and GES databases.

Dr. Ray testified that the risk of a fatality where the first harmful event was a thrown or falling object was 0.003 per billion vehicle miles for a combination truck, 0.004 for a single-unit truck, 0.009 for a light truck, and 0.006 for a passenger car. Her calculations for a fatality or a major injury from a thrown or falling object were 0.004 per billion vehicle miles for a combination truck, 0.009 for a single-unit truck, 0.034 for a light truck, and 0.046 for a passenger car.

Her first opinion, for which she relied upon FARS, GES, the vehicle miles traveled data, and LTCCS, was that the risk of fatality or serious injury as a result of a thrown or falling object was very low. It was a rare event. She relied on the same data for her second opinion, that such risk was higher for a passenger vehicle than for a medium or heavy truck. Her third opinion was that a vehicle with a rake angle similar to passenger vehicles does not prevent penetration of a windshield by a thrown or falling object.

At trial, plaintiffs again objected to Dr. Ray's testimony, particularly her second and third opinions. They argued her statistics were inadmissible under *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348] (*Grimshaw*); her opinions were based on multiple levels of hearsay; and statistics provided an inappropriate method to prove causation.

Navistar argued that Dr. Ray's testimony was not offered to establish causation or a defect, but offered for the risk-benefit analysis under products liability and for the defense of superseding cause. Navistar argued Dr. Ray reviewed national databases and determined this was a rare event; thus, it was not foreseeable for a manufacturer to design for such rare circumstances. The trial court overruled plaintiffs' objections and allowed Dr. Ray to offer her three opinions at trial.

To rebut Dr. Ray's testimony, plaintiffs wanted to recall Keith Friedman, a safety researcher who had opined it was feasible for Navistar to increase the

---

[6] Crump did not testify at trial and plaintiffs did not provide testimony of a statistician.

rake angle of the windshield in the Navistar 8200 truck. Plaintiffs proffered that Friedman would testify that the foundational facts for Dr. Ray's opinions did not exist and her numbers were without support. The trial court ruled Friedman's proposed testimony was not proper rebuttal, but a difference of opinion on how the numbers and factors could be used. In response, plaintiffs moved for a mistrial, arguing the statistics never should have come in. The court denied the motion for a mistrial.

### Other Trial Testimony Relating to Foreseeability

Victor Alvarez, a truckdriver, was also driving north on Interstate Highway 5 through Stockton that morning. A chunk of concrete, weighing 3.49 pounds, hit his truck and "busted out my windshield." To his testimony about these events he added it was, "almost a common occurrence in our industry." Both the state and Navistar objected and the trial court struck the remark as nonresponsive. Plaintiffs' counsel then asked Alvarez if he had been hit by other objects while driving a truck. The court sustained a relevance objection. A second truckdriver, Bill Warren, Jr., testified that he had a rock come through his windshield that morning.

California Highway Patrol Officer Paul McClellan had been dispatched two or three times to reports of an object being thrown at a vehicle in the area of Smith Canal. Two police officers who interviewed Daniel testified that Daniel had said he threw rocks at motorists on three prior occasions.

Ronald W. Nelson, a civil and traffic engineer who had worked for California's Department of Transportation for over 40 years and was now a consultant, testified that vehicle-to-vehicle rock throwing was fairly common as a type of road rage. In his experience, the injury to William due to a rock throwing incident was "[e]xtremely rare." An engineer who did crash testing testified that in all his years of professional experience he had never run into a case like this before.

### Judgment and Appeal

The case was submitted to the jury, which found Navistar could not "have known or have reasonably foreseen that a person would be likely to take advantage of the situation created by Navistar's conduct to commit" an act like Daniel's rock throwing. The court entered judgment on the verdict in favor of Navistar.

Plaintiffs moved for a new trial. They raised the points urged on appeal and others. The trial court denied the motion. Plaintiffs thereafter timely filed a notice of appeal.

DISCUSSION

## I

### *The Requisite Foreseeability for Strict Products Liability Involving Third Party Criminal Conduct*

On appeal, Barbara argues Navistar had a duty to design its trucks to withstand common road debris, even intentionally thrown rocks and concrete chunks. Thus, she contends the jury was improperly instructed that a heightened foreseeability was required to prove a design defect claim just because it involved third party criminality. As we explain, the argument has merit.

### A.

### *Jury Instructions*

Pattern CACI instructions include a set that addresses strict products liability. To define the standard of proof, CACI No. 1203 sets forth the consumer expectation test and CACI No. 1204 articulates the risk-benefit test. At trial, plaintiffs did not claim that Navistar's tractor failed to meet the consumer expectation test. Instead, they pursued only a design defect theory of the case for which the trial court gave CACI No. 1204 as follows:

"The following instruction applies to Navistar, Inc. only.

"William F. Collins and Barbara Collins claim that the 1994 Model 8200 tractor's design caused harm to William F. Collins and Barbara Collins. To establish this claim, William F. Collins and Barbara Collins must prove all of the following:

"(1) That Navistar, Inc. manufactured, distributed or sold the 1994 Model 8200 tractor;

"(2) That the 1994 Model 8200 tractor was used in a way that was reasonably foreseeable to Navistar, Inc; and

"(3) That the 1994 Model 8200 tractor's design was a substantial factor in causing harm to William F. Collins and Barbara Collins.

"If William F. Collins and Barbara Collins have proved these three facts, then your decision on this claim must be for William F. Collins and Barbara Collins, unless Navistar, Inc. proves that the benefits of the design outweigh the risks of the design.

"In deciding whether the benefits outweigh the risks, you should consider the following:

"(A) The gravity of the potential harm resulting from the use of the 1994 Model 8200 tractor;

"(B) The likelihood that this harm would occur;

"(C) The feasibility of an alternate safer design at the time of manufacture;

"(D) The cost of an alternative design;

"(E) The disadvantages of an alternative design."

On the claim against Navistar, the court further instructed: "The precise nature and extent of the injury actually suffered by William Collins does not need to be foreseeable by Navistar for a finding of liability."

Over plaintiffs' objection, the trial court also gave a modified version of CACI No. 433—one of the CACI *negligence* instructions—as follows:

"The State of California and Navistar, Inc. claim that they are not responsible for William F. Collins and Barbara Collins's harm because of the later criminal conduct of Joshua Daniel. The State of California and Navistar, Inc. are not responsible for William F. Collins' [*sic*] and Barbara Collins' [*sic*] harm if the State of California and Navistar, Inc. each prove both of the following:

"(1) That the criminal conduct of Joshua Daniel happened after the conduct of the State of California and/or Navistar, Inc., and;

"(2) That the State of California and Navistar, Inc. did not know and could not have reasonably foreseen that another person would be likely to take advantage of the situation created by the State of California and/or Navistar, Inc.'s conduct to commit this type of act."

The court also gave a modified version of CACI No. 411—another CACI *negligence* instruction—to instruct the jury: "Every person has a right to expect that every other person will use reasonable care and will not violate the law unless he or she knows or should know that the other person will not use reasonable care or will violate the law."

During the conference on jury instructions, plaintiffs had requested that the trial court modify CACI No. 411 to quote the portion of *Bigbee v. Pacific Tel.*

& *Tel. Co.* (1983) 34 Cal.3d 49 [192 Cal.Rptr. 857, 665 P.2d 947] (*Bigbee*) that states: " 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.' " (*Id.* at p. 58, quoting Rest.2d Torts, § 449.)

Navistar objected to plaintiffs' proposed modification. The trial court gave CACI No. 411 as proposed by Navistar.

### B.

### *Special Verdict Form*

The trial court submitted the case to the jury with a special verdict form. The first "question" on the special verdict form was actually a statement that set forth the undisputed fact that "[t]he conduct of Joshua Daniel occurred after Navistar manufactured the 1994 model 8200 tractor."

The special verdict form next asked: "In this case, the conduct of Navistar complained of by Plaintiffs is its manufacture of the 1994 Model 8200 tractor. Could Navistar have known or have reasonably foreseen that a person would be likely to take advantage of the situation created by Navistar's conduct to commit this type of act?"

By a vote of 11 to one, the jury answered "No." As a result, the jury did not reach any other questions in the special verdict form including (1) whether the "design [was] a substantial factor in causing harm to plaintiffs," (2) whether the "benefits of the 1994 Model 8200 tractor's design outweigh the risks of the design," and (3) whether the "tractor [was] used in a way that was reasonably foreseeable to Navistar."

· The unanswered questions on the special verdict form loosely tracked CACI's model verdict form, entitled, "Strict Products Liability—Design Defect—Risk-Benefit Test." The model verdict form asks the jury to answer (1) "Did [*name of defendant*] [manufacture/distribute/sell] the [*product*]?" (2) "Was the [product]'s design a substantial factor in causing harm to [*name of plaintiff*]?" (3) "Did the risks of the [product]'s design outweigh the benefits of the design?" If the jury answers these three questions in the affirmative, the model verdict form asks the jury to calculate the plaintiff's past economic damages, future economic losses, and noneconomic losses. (Judicial Council of Cal., Civ. Jury Instns. (2012) No. VF-1202, at pp. 795–796.)

## C.

### *Duty to Instruct and Review*

■ A trial court has the duty to instruct the jury on the law applicable to the facts of the case. (*Wank v. Richman & Garrett* (1985) 165 Cal.App.3d 1103, 1113 [211 Cal.Rptr. 919].) "The trial court's 'duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision.' (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553 [66 Cal.Rptr.3d 175] (*Thompson Pacific*).) 'A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law.' (*Ibid.*) [¶] When a party challenges a particular jury instruction as being incorrect or incomplete, 'we evaluate the instructions given as a whole, not in isolation.' (*People v. Rundle* (2008) 43 Cal.4th 76, 149 [74 Cal.Rptr.3d 454, 180 P.3d 224] (*Rundle*).) ' "For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." ' (*Ibid.*)" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82 [89 Cal.Rptr.3d 34].)

We review challenges to the propriety of jury instructions in correctly stating the relevant law under the de novo standard of review. (*Cristler v. Express Messenger Systems, Inc., supra*, 171 Cal.App.4th at p. 82.) Likewise, "a special verdict's correctness is analyzed as a matter of law and therefore subject to de novo review." (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 [74 Cal.Rptr.3d 235].)

## D.

### *Strict Products Liability Premised on Design Defect*

■ In the seminal case of *Soule, supra*, 8 Cal.4th 548, the California Supreme Court noted the premise upon which strict products liability rests: "A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way." (*Id.* at p. 560.) Thus, truck manufacturers must anticipate that their vehicles will be involved in traffic accidents. "Because traffic accidents are foreseeable, vehicle manufacturers must consider collision safety when they design and build their products." (*Soule, supra*, 8 Cal.4th at p. 560.)

" 'The foreseeability required is of the *risk of harm*, not of the particular intervening act. In other words, the defendant may be liable if his [or her] conduct was "a substantial factor" in bringing about the harm, though he [or

she] neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred.' (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 976, p. 367.)" (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 18–19 [56 Cal.Rptr.2d 455].)

In *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443] (*Barker*), the California Supreme Court further explained that "a product is defective in design either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of the relevant factors . . . the benefits of the challenged design do not outweigh the risk of danger inherent in such design." (*Id.* at p. 418.)

When a product is alleged to have been defectively designed, " 'a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [Citations.]' (*Barker, supra,* 20 Cal.3d at pp. 430–431, fn. omitted; see also *Gonzalez v. Autoliv ASP, Inc.* (2007) 154 Cal.App.4th 780, 786 [64 Cal.Rptr.3d 908]; CACI No. 1204.)" (*Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 676–677 [115 Cal.Rptr.3d 590].)

## E.

### *Whether Third Party Criminality Affects the Requisite Foreseeability for Strict Products Liability*

The primary issue at trial concerned the question of whether the criminal nature of Daniel's rock throwing affected the foreseeability requirement for plaintiffs' strict products liability claim. Plaintiffs argued that the criminality of the rock throwing did not require a different standard of foreseeability than if the rock had been cast negligently or by an act of nature. Navistar contended that product manufacturers need not anticipate third party criminality when designing their products. Based on our review of well-settled case law, we conclude the same standard of foreseeability for strict products liability applies to the risk of the harm, regardless of the source of the risk.

In *Soule,* the California Supreme Court announced that *"whatever the cause of an accident,* a vehicle's producer is liable for specific collision injuries that would not have occurred but for a manufacturing or design defect in the vehicle. (*Cronin*[ *v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121,] 126 [104 Cal.Rptr. 433, 501 P.2d 1153].)" (*Soule, supra,* 8 Cal.4th at p. 560,

italics added.) *Soule's* holding reiterated that expressed in an earlier California Supreme Court decision, *Bigbee, supra*, 34 Cal.3d 49.

*Bigbee* involved negligence and strict products liability claims for injuries sustained when a telephone booth was struck by a car that was driven by a drunk driver. (*Bigbee, supra*, 34 Cal.3d at p. 52.) The plaintiff asserted a defective design because the door " 'jammed and stuck, trapping' " him inside after he saw the car coming toward the booth. (*Id.* at p. 53.) The defendants, including the manufacturer of the telephone booth, sought summary judgment on the grounds "they had no duty to protect phone booth users from the risk encountered by plaintiff—a car veering· off the street and crashing into the phone booth—since that risk was unforeseeable as a matter of law." (*Id.* at pp. 53–54.) They argued that a drunk driver was "a 'superseding cause' " of the accident so "no act or omission of theirs could be found to be a proximate cause of [plaintiff's] injuries." (*Id.* at p. 54.) The trial court granted summary judgment (*id.* at pp. 55, 60), a result that was reversed by the Supreme Court.

In *Bigbee*, the Supreme Court held that a telephone booth manufacturer owes a duty to design even against reasonably foreseeable criminal acts. *Bigbee* admonishes that "it is well to remember that 'foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' (2 Harper & James, Law of Torts [(1956)] § 18.2, at p. 1020.) One may be held accountable for creating even ' "the risk of a slight possibility of injury if a reasonably prudent [person] would not do so." ' (*Ewart* v. *Southern Cal. Gas Co.* (1965) 237 Cal.App.2d 163, 172 [46 Cal.Rptr. 631], quoting from *Vasquez* v. *Alameda* (1958) 49 Cal.2d 674, 684 [321 P.2d 1] (dis. opn. of Traynor, J.); see also *Crane* v. *Smith* (1943) 23 Cal.2d 288, 299 [144 P.2d 356]; see generally, Rest.2d Torts, § 291.) Moreover, *it is settled that what is required to be foreseeable is the general character of the event or harm—e.g., being struck by a car while standing in a phone booth—not its precise nature or manner of occurrence. (Taylor* v. *Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 600 [110 P.2d 1044]; *Gibson* v. *Garcia* (1950) 96 Cal.App.2d 681, 684 [216 P.2d 119]; see generally, Rest.2d Torts, § 435, subd. 1, com. a.)" (*Bigbee, supra*, 34 Cal.3d at pp. 57–58, italics added.)

The *Bigbee* court held it "evident" that "speeding and/or intoxicated drivers" are common incidents for which manufacturers of products used near roadways must account. (*Bigbee, supra*, 34 Cal.3d at p. 58.) Indeed, the court noted that "[i]t is of no consequence that the harm to plaintiff came about through the negligent or reckless acts of [the drunk driver]. 'If the likelihood that a third person may act in a particular manner is the hazard or one of the

hazards which makes the actor negligent, such an act *whether innocent, negligent, intentionally tortious, or criminal* does not prevent the actor from being liable for harm caused thereby.' " (*Id.* at pp. 58–59, italics added, fn. omitted.)

Also instructive on the issue of whether criminality requires a different standard of foreseeability is the case of *Bunton v. Arizona Pacific Tanklines* (1983) 141 Cal.App.3d 210 [190 Cal.Rptr. 295] (*Bunton*). *Bunton* involved a wrong-way driver on a freeway who was "driving at a high rate of speed and in what was described as a suicidal manner" and who caused a cascade of vehicle collisions that resulted in the death of Leslie Bunton. (*Id.* at p. 219.) The decedent's daughter and husband sued the operator of a tank truck with improperly adjusted brakes. (*Id.* at p. 218.) The plaintiffs introduced evidence that properly adjusted brakes would have prevented the crash with the decedent's vehicle, and the jury found the defendant to have been negligent. (*Ibid.*) The defendant appealed, contending the trial court should have instructed that the wrong-way driver's conduct was a superseding cause that cut off the defendant's liability. (*Id.* at p. 221.) The *Bunton* court rejected the contention, holding that the wrong-way driver caused a foreseeable "road emergency." (*Ibid.*) "Whether the hazard will come in the form of a wrong-way driver, a pedestrian, debris on the roadway, or some other typical or atypical form, the fact that one may encounter a hazard on the roadway necessitating use of one's brakes is a foreseeable risk." (*Id.* at p. 222.) As *Bunton* notes, "Road emergencies are reasonably foreseeable." (*Id.* at p. 221.)

Although *Bunton* involved a claim of negligence, rather than strict products liability, it aptly shows that the exact manner of the injury need not be predicted. Instead, " '[t]he foreseeability required is of the *risk of harm*, not of the particular intervening act. In other words, the defendant may be liable if his conduct was "a substantial factor" in bringing about the harm, though he neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred.' (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 629, pp. 2911–2912; italics in original.)" (*Bunton, supra,* 141 Cal.App.3d at p. 221.)

Like truck brakes, windshields on big rig trucks must be designed in anticipation of common road hazards. The very purpose of a windshield is to protect occupants of a motor vehicle from the elements and road debris. Navistar properly acknowledges "[t]hat objects will hit windshields is implicit in the FMVSS 205 requirement that windshields be strong enough to withstand penetration by a five-pound ball dropped from 12 feet." Navistar also correctly observes that "[t]he relevant consideration is the foreseeability that a thrown or falling object will penetrate the windshield and result in injury."

So long as the road hazard is reasonably foreseeable, the manufacturer must take steps to address common risks caused by negligent drivers, debris thrown into roads by acts of nature, and even third party criminal acts. (*Bunton, supra*, 141 Cal.App.3d at p. 222.) In the case of a rock hitting a windshield, liability for a defective design does not depend on whether the projectile falls from a rock outcropping, passing gravel truck, or the hands of a juvenile delinquent. A windshield is not any less defective because it is pierced by an intentionally, rather than an unintentionally, thrown rock.

To deny recovery to an injured user of an otherwise defective product simply because a common road hazard was caused by criminal behavior would negate the manufacturers' duty to design products to account for reasonably foreseeable risks. Even Navistar acknowledges that "[i]n some cases, intentional torts or criminal acts may be foreseeable and, therefore, within the scope of the risk defendant created, and in such a case the defendant may still be liable for the harm to the plaintiff resulting from the intentional or criminal act." Strict products liability does not depend on the criminal or noncriminal nature of the source of the risk but on its foreseeability. (*Soule, supra*, 8 Cal.4th at p. 560; *Bigbee, supra*, 34 Cal.3d at pp. 57–59.)

Foreseeability is ordinarily a question of fact for the jury. (*Bigbee, supra*, 34 Cal.3d at p. 56.) "It may be decided as a question of law only if, 'under the undisputed facts there is no room for a reasonable difference of opinion.'" (*Ibid.*) Here, it is a question for the trier of fact whether the object in this case—specifically a 2.5-pound chunk of concrete—is a reasonably foreseeable road hazard for a big rig truck to encounter. As the record shows, the frequency of such a road hazard was a contested fact. Thus, we cannot state as a matter of law how heavy, sharp, or large an object the manufacturer must account for in designing windshields.

A vehicle manufacturer's duty to consider reasonably foreseeable risks does not mean it must design its products "to be built like tanks, with an armored plate instead of a glazing windshield and a periscope to provide visibility," as Navistar asserts. It is well established that a manufacturer may defeat liability by showing " 'the benefits of the . . . design outweigh the risk of danger inherent in such design . . . .' " (*Soule, supra*, 8 Cal.4th at p. 567.)

Navistar asserts that "if the crime is not foreseeable, the defendant 'is relieved of responsibility by the intervention of the third person.' " We agree manufacturers need not foresee the unforeseeable. However, to prove a risk was unforeseeable, a manufacturer must show that the intervening act "produce[d] harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him [or her] responsible." (*Soule, supra*, 8 Cal.4th at p. 573, fn. 9.) This principle is

illustrated by the cases on which Navistar relies in asserting that "[o]ther jurisdictions have had no hesitation in holding criminal acts to be superseding causes in actions for product liability."

*Stahlecker v. Ford Motor Co.* (2003) 266 Neb. 601 [667 N.W.2d 244] involved a products liability claim for a tire failure that left a motorist stranded in a remote area. The motorist was not injured by the tire failure but by a murderer who encountered her where her vehicle stopped. (*Id.*, 667 N.W.2d at pp. 250–251.) The murder was held to "negate any causal relationship between the alleged product defects and the injuries and death for which damages" were claimed. (*Id.* at p. 258.) In so holding, the *Stahlecker* court noted it had found "no authority recognizing a duty on the part of the manufacturer of a product to protect a consumer from criminal activity at the scene of a product failure where no physical harm is caused by the product itself." (*Id.* at p. 256.)

*Davis v. Blockbuster, Inc.* (2002) 258 Ga.App. 677 [575 S.E.2d 1] involved a claim against a videotape rental company for selling a children's movie videotape that happened to contain pornography recorded by a prior renter. (*Id.*, 575 S.E.2d at p. 2.) The evidence in *Davis* established that the company "had no reason to know, believe, or suspect that the content or subject matter contained on the Video was anything other than the movie that was identified on the label of the Video." (*Id.* at p. 3.) The plaintiff failed to establish her negligence claim because the defect with the tape was not a reasonably foreseeable consequence of prior videotape rentals. (*Id.* at pp. 2–3.)

*Gaines-Tabb v. ICI Explosives USA, Inc.* (W.D.Okla. 1996) 995 F.Supp. 1304, arose out of claims brought by the victims of the terrorist bombing of the Alfred P. Murrah Federal Building in Oklahoma by Timothy McVeigh and Terry Nichols. (*Id.* at p. 1314.) The plaintiffs alleged that the product, ammonium nitrate fertilizer, was defective because it could have been manufactured with antiexplosive additives. (*Id.* at p. 1309.) The *Gaines-Tabb* court held that the "intervening acts of McVeigh and Nichols and/or others alleged by Plaintiffs, which acts were both tortious and criminal, were independent as a matter of law." (*Id.* at p. 1315.) The fact that the fertilizer was capable of being misused for terrorist purposes did not render it a defective product. (*Ibid.*)

In *Williams v. RCA Corp.* (1978) 59 Ill.App.3d 229 [17 Ill.Dec. 144, 376 N.E.2d 37], a security guard attempted to use a two-way radio to call for help during a robbery. (*Id.*, 376 N.E.2d at p. 38.) Unbeknownst to the guard, the radio did not work when he attempted to call for help. (*Ibid.*) When the guard attempted to make an arrest by himself, he was wounded by the robber. (*Ibid.*) The *Williams* court rejected his strict products liability claim because

the radio was a "product designed for short-range, out-of-presence communication between individuals possessing such units and not the prevention of criminal attack." (*Id.* at p. 39.) Thus, it could not "fairly be said, under the circumstances here, that the manufacturer should reasonably foresee that the security guard would approach the armed robber before he became aware of the presence of his support—whether or not he had knowledge of the malfunctioning of the receiver." (*Ibid.*)

The product in this case failed to provide exactly the protection for which it was designed, namely to shield a driver of the truck from road hazards. The windshield did not cause injury by some bizarre misuse of the product,[7] such as in *Davis v. Blockbuster* or *Gaines-Tabb v. ICI Explosives USA, Inc.* It did not play a tangential role as did the products in *Stahlecker v. Ford Motor Co.* or *Williams v. RCA Corp.* The windshield's piercing did not merely strand William in an unfortunate situation. The alleged defect with the windshield concerned its use as intended—literally to shield truck occupants from wind and other road hazards.

## F.

### *The Definition of Negligence in Premises Liability Actions Does Not Apply in Strict Products Liability Actions*

During trial, the parties and trial court wrestled with the question of how to apply the definition of negligence for premises liability to a cause of action for strict products liability based on design defect. The simple answer is that the definition of the risk to be avoided in a premises liability case should not be grafted onto a products liability action.

■ Although labeled "*strict* products liability" (italics added), an action against a manufacturer for design defect may nonetheless be defeated by showing the risk is one for which there is no duty to account. A manufacturer may tender defenses based on a fundamental principle upon which the law of unintentional torts rests, i.e., a *reasonable* duty to avoid being the cause of injury to another. (See 1 Dobbs et al., The Law of Torts (2d ed. 2011) § 141, p. 442 & fn. 1 ["The defendant cannot be negligent unless a reasonable person would have foreseen the risk of injury and would have done something effective to prevent it."].) In addition, proof that "on balance the

---

[7] In one of its notices of additional authorities, Navistar lists *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283 [144 Cal.Rptr.3d 326] as relevant to Barbara's argument "that a superseding cause is unavailable in a product liability action generally." This case does not assist Navistar's position because it is a product misuse case. There, the court noted that "[p]roduct misuse, an affirmative defense, is a superseding cause of injury that absolves a tortfeasor of his or her own wrongful conduct only when the misuse was ' "so highly extraordinary as to be unforeseeable." ' " (*Id.* at p. 1308.)

benefits of the challenged design outweigh the risk of danger inherent in such design" defeats liability. (*Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1233 [115 Cal.Rptr.3d 151] [articulating the factors to be considered for the risk-benefit test].) Thus, the issue of foreseeability of the risk is properly focused on consideration of whether the risk was foreseeable such that the manufacturer had a duty to design for it. In addressing the foreseeability of the risk, the source of the risk is not relevant and does not require heightened foreseeability to imbue the manufacturer with a duty to account for the risk in its design.

In the area of premises liability, there is also a reasonable duty to avoid being the cause of injury. A defendant in a premises liability action is not liable for failing to anticipate criminal conduct that is bizarre or too rare to be reasonably foreseen. This principle is aptly illustrated by Navistar's cited case of *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138 [12 Cal.Rptr.3d 615, 88 P.3d 517] (*Wiener*). *Wiener* involved a driver who deliberately drove his car through the chain-link fence surrounding a daycare center. (*Id.* at p. 1143.) Parents of the slain children brought a premises liability action against the daycare center and the landlord based on the duty to protect the children from harm. (*Id.* at pp. 1143, 1145.) The California Supreme Court held that "defendants owed no duty to plaintiffs because [the driver's] brutal criminal act was unforeseeable. [Citation.] No evidence indicated defendants' child care facility had ever been the target of violence in the past and no hint existed that either defendants or any other similar business establishment had ever been the target of any criminal acts. Indeed, here, the foreseeability of a perpetrator's committing premeditated murder against the children was impossible to anticipate, and the particular criminal conduct *so outrageous and bizarre*, that it could not have been anticipated under any circumstances." (*Id.* at p. 1150, italics added.) A showing of outrageous and bizarre third party conduct relieves an alleged tortfeasor of liability. (*Ibid.*)

However, *Wiener, supra,* 32 Cal.4th 1138 does not aid Navistar in its quest for a defense based on criminal conduct by a third party. As *Wiener* holds, the involvement of criminal conduct is relevant in a premises liability case because a landlord has " 'the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures.' " (*Id.* at p. 1146.) By contrast, in this case it does not make sense to ask whether a product's design invited criminal behavior against the product's user. Here, the jury was asked the nonsensical question of whether Navistar's design allowed Daniel to take advantage of the windshield rake. The evidence showed Daniel engaged in reckless, juvenile behavior by throwing rocks and concrete at random vehicles—not to take advantage of the possibly insufficient slope of Navistar truck windshields.

 Accordingly, we conclude the definition of the risk to be avoided in premises liability does not apply to strict products liability cases. Based on this conclusion, as explained below, the principles of negligence in CACI Nos. 433 and 411 should not have been used to instruct the jury on liability in this strict products liability case.

## G.

### *The Trial Court's Giving of CACI No. 433*

Barbara challenges the trial court's giving of CACI No. 433 in this strict products liability action.[8] The trial court's modification of CACI No. 433 appears to have been intended to apply the principle of negligence law that unforeseeable criminal conduct cuts off a tortfeasor's liability. (See generally *Kane v. Hartford Accident & Indemnity Co.* (1979) 98 Cal.App.3d 350, 360 [159 Cal.Rptr. 446].) CACI No. 433 sets forth the heightened foreseeability that is required before an intervening criminal act will relieve a defendant of liability for negligence. (*Ibid.*) A third party's criminal conduct becomes actionable if the negligent tortfeasor has created a situation that facilitated the crime. (*Ibid.*)

CACI No. 433 does not adapt well to this strict products liability case.[9] Navistar's attempt to defend CACI No. 433 based on the assertion it is "liable for [William's] injuries only if it foresaw or should have foreseen that Daniel would act in that 'particular manner' " ignores the long-established rule of tort liability that it is " 'not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.' " (*Palsgraf v. Long Island Railroad Co.* (1928) 248 N.Y. 339, 344 [162 N.E. 99] (maj. opn. of Cardozo, J.), quoting *Munsey v. Webb* (1913) 231 U.S. 150, 156

---

[8] During oral argument, Navistar for the first time argued that plaintiffs forfeited an appellate challenge to the giving of CACI No. 433 or the special verdict form for failure to request a limiting instruction to prevent the premises liability concepts of superseding cause asserted against the State of California from being applied to the strict products liability cause of action against Navistar. The argument is untimely. (*New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.* (1992) 7 Cal.App.4th 1088, 1098 [9 Cal.Rptr.2d 469] [arguments may not be raised for the first time at oral argument].)

In any event, the argument is without merit. During the conference on jury instructions, plaintiffs objected to the giving of CACI No. 433. Having lost on their objection, plaintiffs did not forfeit the issue by failing to raise a futile objection to the same concepts incorporated into the special verdict. (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406 [138 Cal.Rptr.3d 464].)

[9] We have no occasion to consider the correctness of CACI No. 433 for the type of negligence case for which it was drafted. (See Judicial Council of Cal., Civ. Jury Instns., *supra*, at pp. 292–293.) Here, we consider only a modified version of the instruction that was given in a strict products liability case.

[58 L.Ed. 162, 34 S.Ct. 44]; accord, *Torres v. Xomox Corp., supra,* 49 Cal.App.4th at pp. 18–19 [holding " '[t]he foreseeability required is of the *risk of harm,* not of the particular intervening act' "].)

CACI No. 433 erroneously allowed Navistar a complete defense based on a heightened standard of foreseeability inapplicable to plaintiffs' design defect claims. Specifically, CACI No. 433 allowed Navistar to secure a defense verdict by showing it "could not have reasonably foreseen that another person would be likely to take advantage of the situation created by . . . Navistar, Inc.'s conduct to commit this type of act." However, Navistar did not create a situation that Daniel took advantage of in order to commit a crime. Daniel did not throw the concrete at William's truck because he perceived a defective angle or composition of the windshield. CACI No. 433 erroneously introduced a test that does not make sense in this products liability case.

## H.

### *Modified Version of CACI No. 411*

Barbara contends the trial court committed further instructional error by giving Navistar's version of CACI No. 411. We agree even though it is undoubtedly true, as CACI No. 411 states, that "[e]very person has a right to expect that every other person will use reasonable care and will not violate the law unless he or she knows or should know that the other person will not use reasonable care or will violate the law." (Cf. *Celli v. Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 523 [105 Cal.Rptr. 904].)

This negligence instruction, however, was as misplaced in this case as CACI No. 433. CACI No. 411 reiterated the focus on the criminal nature of Daniel's acts rather than directing the jury to determine whether it was reasonably foreseeable that a big rig truck would meet a projectile of the size and shape as pierced the windshield. Rather than focusing on whether Navistar could expect law-abiding behavior to surround the operation of its trucks, the jury should have been asked whether the allegedly defective design violated the risk-benefit test for products liability. As the *Soule* court held, "instructions are misleading and incorrect if they allow a jury to avoid this risk-benefit analysis in a case where it is required." (*Soule, supra,* 8 Cal.4th at p. 568.) With CACI No. 411, the court allowed the jury to believe the criminal nature of Daniel's act relieved Navistar of the duty to manufacture a nondefective product. This negligence instruction—like CACI No. 433—should not have been given.

# I.

## *Prejudice*

Having found instructional error in the giving of CACI Nos. 411 and 433, we must assess whether the misinstruction warrants reversal. As the *Soule* court held, "there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule, supra*, 8 Cal.4th at p. 580.) Thus, we consider "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581.) "Prejudice appears '[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction . . . .' " (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946], quoting *Robinson v. Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)

The jury in this case was properly instructed with CACI No. 1204, which set forth the applicable law for strict products liability. Nonetheless, we conclude the errors in giving CACI Nos. 411 and 433 as well as the special verdict form were prejudicial because they prevented the jury from engaging in the risk-benefit test that applies to design defect claims. (*Soule, supra*, 8 Cal.4th at p. 570; see Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) Thus, the jury never reached the central issue of whether the windshield was defectively designed.

Instead, CACI Nos. 411 and 433 allowed Navistar to shift the blame entirely to Daniel. Navistar's counsel's closing argument emphasized, "All we had to deal with, all we had to work with, was a 15-year-old kid who's standing out there in the middle of the night with no one around, no one watching him, throwing chunks of concrete onto a freeway." Consistent with CACI No. 433, as given, Navistar's attorney argued it did not foresee that " 'another person [(Daniel)] would be likely to take advantage of the situation created by Navistar's conduct,' that is our truck . . . ."

Moreover, CACI No. 411 was quoted by Navistar's attorney to further emphasize Daniel's criminal act. Counsel argued, "Every person—every one of you, every one of us—'has a right to expect that every other person will use reasonable care and will not violate the law'—*and we know that Joshua*

*Daniel violated the law*—'unless he or she knows or should know that the other person will not use reasonable care or will violate the law.' " (Italics added.)

As we have explained, CACI Nos. 411 and 433 were erroneously given because a product must be designed to account for foreseeable risks even if they happen to result from criminal conduct. (*Soule, supra*, 8 Cal.4th at p. 560.) We find the jury relied on the erroneous instructions because the jury answered "No" on the special verdict form question, "Could Navistar have known or have reasonably foreseen that a person would be likely to take advantage of the situation created by Navistar's conduct to commit this type of act?"

Due to the order of the questions on the special verdict form, the jury's answer to the first question prevented it from considering the question of whether the truck's windshield design was a substantial cause of plaintiffs' injuries. The jury also did not consider whether the benefits of the truck's windshield design outweighed the risks of the design. The jury clearly relied on misleading and incorrect instructions concerning the effect of third party criminal conduct on the standard of reasonable foreseeability for strict products liability claims. Accordingly, we reverse and remand for a new trial.

## II

### *Exclusion of Evidence Regarding Glass-plastic*

Barbara contends the trial court erred in excluding evidence of glass-plastic based on federal preemption. She argues the federal safety standard, FMVSS 205, permits various windshield glazing designs, but does not require any particular design.[10] Accordingly, Barbara asserts that a state court requirement to use glass-plastic would not conflict with the federal safety standards.

The trial court based its decision to exclude evidence of glass-plastic on *Geier v. American Honda Motor Co.* (2000) 529 U.S. 861 [146 L.Ed.2d 914, 120 S.Ct. 1913]. *Geier* held a federal safety standard, Federal Motor Vehicle Safety Standard No. 208 (FMVSS 208), which provided manufacturers with a range of choices for passive restraint devices, preempted a state common law tort action in which the plaintiff claimed the defendant manufacturer, who

---

[10] Navistar requests that this court take judicial notice of SAE, American National Standard for Safety Glazing Materials for Glazing Motor Vehicles and Motor Vehicle Equipment Operating on Land Highways—Safety Standard: Standard ANSI/SAE Z26.1-1996, Approved by American National Standards Institute (1997). This document relates to federal safety standards and glass-plastic glazing material. We grant the unopposed request for judicial notice.

was in compliance with FMVSS 208, should nevertheless have equipped the vehicle with airbags. (529 U.S. at pp. 864, 886 [146 L.Ed.2d at pp. 921, 935].)

Recently, in *Williamson v. Mazda Motor of America, Inc.* (2011) 562 U.S. ___ [179 L.Ed.2d 75, 131 S.Ct. 1131], the United States Supreme Court held the subsequent version of FMVSS 208, which gave manufacturers a choice of lapbelts or lapbelts with shoulder harnesses for rear inner seats, did not preempt a state tort suit that claimed lap-shoulder belts were required. Also, subsequent to the trial court's ruling, the Fifth Circuit Court of Appeals held FMVSS 205 was best understood as a minimum safety standard and it did not preempt common law negligence and strict liability claims. (*O'Hara v. General Motors Corp.* (5th Cir. 2007) 508 F.3d 753, 763.)

Based on the development of case law after *Geier v. American Honda Motor Co., supra*, 529 U.S. 861, Navistar concedes the trial court's ruling excluding the glass-plastic evidence was error and plaintiffs should have been allowed to present evidence on their glass-plastic theory. However, Navistar contends the error does not require reversal because the jury found Daniel's criminal conduct to have been the superseding cause of the accident. We accept the concession regarding federal preemption but reject the assertion of harmless error. The exclusion of the glass-plastic evidence was prejudicial because plaintiffs were entitled to show that alternative safer designs rendered the product unreasonably dangerous. (*Soule, supra*, 8 Cal.4th at p. 562.)

Navistar argues that permitting a products liability action based on failure to use one of the particular window glazing options permitted by FMVSS 205 would be contrary to sound public policy. We reject the argument. *Soule* holds that one of the factors a jury may consider in assessing a design defect claim is "the mechanical feasibility of a safer alternative design . . . ." (*Soule, supra*, 8 Cal.4th at p. 562.) Elsewhere, the California Supreme Court has recognized "past design defect decisions demonstrate that, as a practical matter, in many instances it is simply impossible to eliminate the balancing or weighing of competing considerations in determining whether a product is defectively designed or not." (*Barker, supra*, 20 Cal.3d at p. 433.) Heeding the guidance of the California Supreme Court's holdings that alternative designs are pertinent to the jury's consideration of a design defect claim, we conclude plaintiffs' evidence regarding alternative glass-plastic windshield design was erroneously excluded.

## III

### *Admission of Dr. Ray's Testimony*

At trial, Dr. Ray gave three opinions: (1) the risk of a fatality or incapacitating injury as a result of a crash where the first harmful event is a thrown or falling object is very low; (2) the risk is even lower in a heavy or combination truck than it is in passenger vehicles; and (3) a vehicle with a windshield at a rake angle similar to a passenger car or light truck can still have instances where an object will penetrate the windshield. Barbara contends the trial court erred in admitting the first and second opinions. She contends such testimony was irrelevant, lacked foundation, was unreliable, and contained multiple levels of hearsay.

"The trial court is 'vested with broad discretion in ruling on the admissibility of evidence.' [Citation.] '[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion.' [Citation.] ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citation.]' " (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431 [77 Cal.Rptr.2d 574].)

### A.

### *Relevance*

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Barbara contends Dr. Ray's opinions on the foreseeability of rock throwing incidents were irrelevant because her opinions, and the databases on which she relied, were limited to incidents resulting in death or serious injury. Due to this limitation, Dr. Ray had no data and could not opine as to how often people throw objects at cars; how many objects, per billion vehicle miles traveled, penetrate the passenger compartment; or how often an occupant of a vehicle receives any injury from a thrown object. Barbara contends the relevant issue was the risk of thrown rocks, not the risk of thrown rocks causing death or serious injury.

Barbara takes too narrow a view of relevancy. Evidence is relevant if it has "*any* tendency" to prove or disprove a disputed fact. The limitations of

Dr. Ray's databases and thus her opinions were fully explored on cross-examination. The failure to have more complete data goes to the weight of the evidence, not its admissibility. (See *Pelayo v. J. J. Lee Management Co., Inc.* (2009) 174 Cal.App.4th 484, 494 [94 Cal.Rptr.3d 502] [issues about clarity and certitude go to credibility and weight, not admissibility].)

## B.

### *Lack of Foundation and Reliability*

■ An expert's opinion is limited to an opinion that is based on matter "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates." (Evid. Code, § 801, subd. (b).) Upon objection, a court "shall" exclude opinion testimony "that is based in whole or in significant part on matter that is not a proper basis for such an opinion." (Evid. Code, § 803.)

Dr. Ray testified her opinions were based upon matter reasonably relied on by other experts. Her opinions were based upon databases maintained by the NHTSA. FARS was the most widely relied upon traffic safety database. Both the NASS/GES and the NASS/CDS were commonly used and relied upon by scientists, engineers, statisticians, and traffic safety professionals. Dr. Ray did a search on Factiva to check her opinion, but she did not rely on that database for her opinion.

Barbara contends Dr. Ray's opinion that the risk of death or incapacitating injury from a traffic accident involving a falling or thrown object was very low was inadmissible under *Grimshaw, supra,* 119 Cal.App.3d 757 because the sample size was too small. In *Grimshaw,* Ford attempted to introduce a statistical study from an accident database maintained by the State of Washington to show that, proportionately, Pinto cars produced no greater chance of injury or death from fire than other vehicles. The trial court excluded the evidence under Evidence Code section 352, noting the study encompassed only a small number of collisions resulting in Pinto fires, "thus rendering the sampling open to misleading inferences." (119 Cal.App.3d at p. 792.) The court also found the study's reliability questionable. (*Ibid.*) The appellate court found no abuse of discretion. (*Ibid.*)

*Grimshaw, supra,* 119 Cal.App.3d 757 does not support Barbara's contention because it does not address the necessary foundation for an expert opinion. The statistical study in *Grimshaw* was excluded under Evidence Code section 352; the court found its probative value substantially outweighed by the potential for prejudice and that the evidence would confuse the jury and consume too much time. (*Grimshaw, supra,* at p. 792.) Plaintiffs made no

section 352 objection here. Dr. Ray testified that the databases were commonly relied upon by experts in the traffic safety field. In the Evidence Code section 402 hearing, Dr. Ray testified that plaintiffs' statistician also relied on the FARS and GES databases.

Barbara also contends Dr. Ray's data on objects striking windshields were unreliable. She relies on the declaration of Keith Friedman, a safety researcher. Friedman submitted a declaration in support of plaintiffs' motion to exclude Dr. Ray's testimony. Friedman declared the data Dr. Ray relied upon were "entirely unreliable" because they were not collected in the field, but taken from police reports. The reports did not specifically ask whether the incidents involved an object penetrating a windshield. Since the data were not collected systematically, Friedman declared, there would be underreporting.

Friedman's declaration was contradicted by Dr. Ray's testimony about the widespread reliance by experts on the databases and the accuracy of such databases. The record does not include the trial court's ruling on the motion to exclude Dr. Ray's testimony, so we cannot determine how the court assessed the issue of reliability. We note, however, that the court commented later that Friedman's use of statistics did not make him an expert. Presumably, the court found Dr. Ray more credible on the issue of the reliability of the databases. Determinations of credibility are not disturbed on appeal. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 6 [5 Cal.Rptr.3d 34].)

## C.

### *Hearsay*

The data in the FARS and GES databases originated with traffic collision reports by police officers. Dr. Ray testified to the details of the data in the FARS and GES databases, providing numbers for the risk of fatality or serious injury in an accident involving a thrown or falling object per billion vehicle miles traveled.

Barbara contends Dr. Ray's testimony about the details of data in the databases was inadmissible because it was multiple levels of hearsay. First, she contends that under Vehicle Code section 20013, an accident report may not be used as evidence at trial. Barbara misreads the Vehicle Code. Nothing in it precludes admission of data from federal traffic safety databases at trial.

Subject to certain exceptions not applicable here, Vehicle Code section 20013 provides: "No such accident report shall be used as evidence in any trial, civil or criminal, arising out of an accident . . . ." The "such accident report" refers to accident reports required by Vehicle Code section 20008 of

every driver involved in an accident resulting in injuries or death. Such reports are confidential. (Veh. Code, § 20012.) "It is undisputed that the purpose of the confidentiality accorded accident reports is to encourage those persons who are required to make them to give a full and accurate account. [Citation.]" (*Davies v. Superior Court* (1984) 36 Cal.3d 291, 299 [204 Cal.Rptr. 154, 682 P.2d 349] (*Davies*).)

The data in the federal databases are derived from accident reports, just as the data in California's Traffic Accident Surveillance Analysis System (TASAS) are derived from accident reports. (*Davies, supra*, 36 Cal.3d at p. 300.) In *Davies*, our Supreme Court held the provisions of the Vehicle Code "do not provide that TASAS data and other information generated from accident reports are to be kept confidential, and confidentiality is unnecessary to achieve their purpose." (*Ibid.*) Further, while required reports filed by drivers and passengers of vehicles involved in accidents resulting in death or bodily injury are privileged under Vehicle Code section 20012, reports of accidents made by investigating officers are not. (*People v. Ansbro* (1984) 153 Cal.App.3d 273, 277 [200 Cal.Rptr. 210].)

■ Next, Barbara contends the traffic reports that serve as the foundation of the federal databases contain multiple levels of hearsay and do not qualify as business records. While an expert may rely on inadmissible hearsay in forming an opinion and may state the matters on which he or she relied, the expert may not testify as to the details of those matters that are inadmissible hearsay. (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1525 [3 Cal.Rptr.2d 833]; *Grimshaw, supra*, 119 Cal.App.3d 757, 788–789.) Barbara contends Dr. Ray could not testify as to the hearsay details in the reports.

Again, Barbara misunderstands that Dr. Ray testified to the databases' compilation of statistics, not the traffic reports themselves. Such compilations are admissible under Evidence Code section 1340: "Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business as defined in Section 1270." Dr. Ray testified the databases were accurate, and commonly used and relied upon by traffic safety experts and statisticians. The trial court did not abuse its broad discretion in admitting into evidence the data from the federal databases and Dr. Ray's expert testimony based on those data. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1276 [11 Cal.Rptr.3d 317].)

## IV

### *Exclusion of Friedman's Rebuttal Testimony*

To rebut Dr. Ray's testimony on foreseeability, plaintiffs offered rebuttal testimony by Keith Friedman. Friedman would testify Dr. Ray's conclusions were not reliable; "her statistics aren't supported by the databases" and are inaccurate. Friedman believed there was a large amount of data missing from the databases. He questioned how Dr. Ray calculated her statistics and believed she did not account for a number of factors.

Plaintiffs had not disclosed Friedman as an expert on statistical issues. Friedman did not testify about statistics in his deposition. Plaintiffs had disclosed a statistician, but chose not to call him as a witness at trial.

"A party may call as a witness at trial an expert not previously designated by that party if either of the following conditions is satisfied: [¶] (a) That expert has been designated by another party . . . . [¶] (b) That expert is called as a witness to impeach the testimony of an expert witness offered by any other party at the trial. This impeachment may include testimony to the falsity or nonexistence of any fact used as the foundation for any opinion by any other party's expert witness, but may not include testimony that contradicts the opinion." (Code Civ. Proc., § 2034.310.)

The trial court excluded the testimony on the basis that it was not proper rebuttal; the court found Friedman just offered a different opinion. Further, the court questioned his qualifications.

The trial court properly excluded Friedman's proposed rebuttal under Code of Civil Procedure section 2034.310. Friedman did not propose to testify to the falsity or nonexistence of any fact in the databases Dr. Ray used. Instead, he would testify that in his opinion the databases were not reliable and Dr. Ray's opinions were inaccurate and not supported by the databases. He challenged how Dr. Ray arrived at her opinions. Thus, Friedman's proposed testimony would contradict Dr. Ray's opinions. Since he had not been disclosed as an expert on statistics, his testimony was improper rebuttal.

## V

### *Exclusion of Alvarez's Testimony*

Barbara contends the trial court erred in excluding the testimony of Victor Alvarez that went to the foreseeability of objects hitting trucks. When answering a question about what happened on December 4, 1997, Alvarez

responded a rock "busted" his windshield, which was "almost a common occurrence in our industry." On defense motion, the court struck the testimony as nonresponsive. Alvarez then volunteered that "it's happened several times since." The court sustained a relevancy objection to the next question: "Driving a truck, have you been hit by other objects?"

"A witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party." (Evid. Code, § 766.) Alvarez's comment about common occurrences was nonresponsive to a question about what happened on the day of the incident. The trial court did not err in striking that portion of his answer.

The followup question about whether Alvarez had been hit by other objects came right after his volunteered statement about subsequent incidents. As such, the question appeared designed to elicit testimony about subsequent incidents of objects hitting trucks on the highway. "The question of the admissibility of evidence of prior and subsequent accidents is primarily one for the trial court and is confined to its sound discretion. [Citation.]" (*Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 365 [133 Cal.Rptr. 42].) While evidence of subsequent incidents may be admissible for some purposes, such as to show a dangerous condition or a design defect, it would not be relevant on the issue of knowledge or notice, the purpose Barbara advances on appeal for admission of the evidence. (*Ibid.*) Accordingly, the trial court did not abuse its discretion in excluding the evidence as irrelevant.

## VI

### *Summary Adjudication on Punitive Damages*

Barbara's opening brief argues that the trial court erred in granting Navistar's motion for summary adjudication on the claim for punitive damages. In her reply brief, she withdraws the claim. We accept the withdrawal of the argument.

## DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion. Barbara Collins shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (3) & (5).)

Raye, P. J., concurred.

**DUARTE, J.,** Concurring and Dissenting.—I concur in the majority opinion except as to part I, I. of the Discussion, from which I respectfully dissent, as I disagree with the majority's conclusion that the trial court's error in instructing the jury resulted in prejudice to plaintiff's case.

In my view, had there not been admitted error in the trial court's exclusion of the glass-plastic evidence, the instructional error would be harmless due to the paucity of admissible evidence introduced by plaintiff on the issue of the foreseeability of large rocks hitting truck windshields and Navistar's corresponding duty to design for such occurrences.

Therefore, I respectfully dissent from part I, I.

Respondent's petition for review by the Supreme Court was denied July 17, 2013, S210583.